UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

+------------------------------------+
| TERENCE JONES                      |
|                                    |
|          Plaintiff,                |
|                                    |
|     v.                             |
|                                    |
| SEAN DALTON, et al.                |
|                                    |
|          Defendants.               |
+------------------------------------+

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 09-138
(JEI/KMW)

**OPINION**

**APPEARANCES:**

WILLIAM H. BUCKMAN LAW FIRM
William H. Buckman
Lilia Londar
110 Marter Avenue
Suite 209
Moorestown, NJ 08057
        Counsel for Plaintiff

ARCHER & GREINER P.C.
John C. Connell
John Patrick Kahn
One Centennial Square
Haddonfield, NJ 08033
        Counsel for Defendants Sean Dalton and John Porter

BAKER, SCOTT & GELFAND
A. Michael Barker
Todd J. Gelfand
Linwood Greene
210 New Road
Suite 12
Linwood, NJ 08221
        Counsel for Michael Schaeffer

RICHARDON & GALELLA
Allan E. Richardson
Charles B. Austermuhl
142 Emerson Street
Suite B

Woodbury, NJ 08096
     Counsel for Defendants Michael Schaeffer, Russell Marino and
Township of Woolwich


**IRENAS**, Senior District Judge:

     Presently before the Court are three separate Motions for

Summary Judgment.  (Dkt. Nos. 117, 120, 124)  Plaintiff's claims

arise from an allegedly unlawful police stop and, when Plaintiff

complained of the misconduct, a retaliatory criminal prosecution.


                              **I.**

     Despite many of the pertinent facts of this case having been

captured on video, the inferences drawn from those events are

bitterly disputed.  For the purposes of this Motion, the Court

must resolve those disputes in favor of Plaintiff.  *See Pollock*

*v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

     After a Super Bowl party, late on February 4, 2007,

Plaintiff Terence Jones, an African American male, was returning

from Philadelphia to his home in southern New Jersey.  (Jones'

Facts at ¶¶ 8, 15)[1]  It was a windy night with sub-zero

temperatures.  Due to an accident blocking Plaintiff's customary

route, Jones used his navigational system to find a detour.  (*Id.*

at ¶ 29)  Covering unfamiliar terrain, Jones accidentally missed

_____

     [1] Citations to "Facts" refer to the parties' obligation to submit
Statements of Material Facts pursuant to L.Civ.R. 56.1.

a left-hand turn onto Swedesboro Pualsboro Road.  (*See* Map, Schaeffer's Facts, Ex. 11)[2]  Jones quickly rectified the situation by making a U-turn in the parking lot of RTR Rentals. (*Id.* at ¶ 20)

Upon witnessing Jones exit the parking lot late at night, Defendant Officer Michael Schaeffer became suspicious and followed Jones for several miles.  (*Id.* at ¶¶ 26-27, 29, Ex. 11) Schaeffer's suspicion was further aroused when Jones took a slightly indirect route from the parking lot to County Road 538. (Schaeffer's Facts at ¶ 37)

At 11:59 PM, Officer Schaeffer pulled Jones over.  (Jones' Facts at ¶ 9)  Once stopped, Officer Schaeffer quickly approached Jones' driver-side window and brashly questioned Jones regarding his presence at an "industrial area" late at night.  (*Id.*, Tr. Motor Vehicle Recording ("MVR"), Ex. 12 at 1; MVR, Ex. 15)[3] Before awaiting a response to his initial questions, Schaeffer also demanded to see Jones' license and registration.  (*Id.* at Ex. 15)  Never having been to the area, Jones clearly did not understand that Schaeffer considered the parking lot of RTR Rentals to be an industrial area.  (*Id.*, Tr. MVR, Ex. 12 at 3) As Jones attempted to comply with Schaeffer's rudely delivered

---

[2] "Map" refers to an "accurate reflection" of the route Plaintiff took as reflected on googlemaps.com.

[3] "MVR" refers to the Motor Vehicle Recording of the incident captured by Officer Schaeffer's mounted onboard video camera.

barrage of directives and questions, Schaeffer's frequent interruptions delivered with increasing irritation and condescension prevented any semblance of rational discourse. (*Id.*, MVR, Ex. 15)

Jones, a twelve year veteran of the Philadelphia Police Department, was clearly taken aback by Schaeffer's tone and demeanor. (*Id.*)  When Schaeffer finally quieted long enough for Jones to properly explain the situation, Schaeffer quickly retorted, "Why didn't you say that the first time I asked you?" (*Id.*, Tr. Video, Ex. 12 at 3)  Despite Schaeffer's rudeness, Jones remained calm, collected and respectful at all times. (*Id.*)

Not satisfied with the specificity of Philadelphia as a city, Schaeffer pried into the details of Jones' journey. Jones responded in a firm yet respectful voice, "Where at in Philadelphia am I coming from?  I don't feel as though I have to tell you."  (*Id.*)

Schaeffer did not appreciate the response.  "Alright, well, well, at this point I'm conducting an investigation!"  (*Id.*)

As a result, Schaeffer began to repeatedly ask Jones whether he had been drinking alcohol.  (*Id.* at 4)  Jones replied that he was not a drinker.  (*Id.*)  That answer prompted Schaeffer to conduct a fruitless plain view search of Jones' backseat.  (*Id.*)

Approximately seven minutes after pulling Jones over,

4

Schaeffer returned to his car and called for backup.  (*Id.* at 5)
While waiting, Schaeffer used the loudspeaker to scream
profanities at Jones for supposedly "reaching around."  (*Id.*)

After several minutes, Schaeffer requested dispatch to run
Jones' record.  (*Id.*)  When asked the suspect's name, Schaeffer
reported, "Ahh... Terrence Jones, unfortunately."  (*Id.*)  As
later became evident, Jones was known to Defendants because,
approximately one week prior, Jones had filed a complaint
alleging that a citizen had threatened him with a gun while
yelling racial epithets.  (*Id.* at ¶ 114)  The prosecutors,
however, did not file criminal charges because Jones supposedly
lacked credibility.  (*Id.* at ¶ 115)

Shortly thereafter, Schaeffer's superior officer, Sergeant
Massing, arrived and Schaeffer explained the situation and
intimated his desire to escalate the encounter.  (*Id.*, Tr. MVR,
Ex. 12 at 6)  Schaeffer declared, "I'm gonna get him out and test
him, and ask him to confess."  (*Id.*)  Massing did not object to
Schaeffer's proposed course of action.

Approximately 17 minutes after the stop, Schaeffer asked
Jones for permission to search the vehicle several times.  (*Id.*
at 9)  Each time, Jones respectfully declined and asked to go
home.  (*Id.* at 9)

Schaeffer next required Jones to submit to a sobriety field
test.  (*Id.* at 10)  Ironically though, when Massing first

5

arrived, Schaeffer admitted that "I can't tell if he's been drinking cause it's too windy and too damn cold!" (*Id.* at 6) Before complying, Jones asked Schaeffer if he could roll up his windows to secure his vehicle, but Schaeffer refused. (*Id.* at 10)

Once outside, Schaeffer asked whether Jones possessed any weapons. (*Id.* at 11)  Although Jones replied in the negative, Schaeffer searched Jones - not by patting him down, but by inserting his hands into Jones' pockets. (*Id.*, MVR, Ex. 15)  The search revealed the keys to Jones' second vehicle - a BMW. (*Id.*) Shocked, Schaeffer asked if Jones really owned a BMW and the Lincoln Navigator he was currently driving. (*Id.*, Tr. MVR at 11, Ex. 12)  Jones respectfully replied affirmatively to Schaeffer's condescending question. (*Id.*)

After searching Jones, Schaeffer and Massing conducted the sobriety test. (*Id.*, MVR, Ex. 15)  Although Schaeffer accused Jones of having watery eyes, Massing suggested that sub-zero temperatures could have that effect. (*Id.*)

Approximately twenty minutes into the stop, Schaeffer left Massing and Jones at the rear of the vehicle and approached Jones' front passenger-side door. (*Id.*)  Due to the angle of the video camera, the MVR did not capture Schaeffer's actions; however, Schaeffer remained in that position for approximately thirty seconds. (*Id.*)  The angle of Schaeffer's toes, which are

6

the only visible part of Schaeffer's body, indicate that Schaeffer was leaning forward into the cabin of the vehicle. (*Id.*)  Because Schaeffer refused to allow Jones to roll up his windows, a reasonable inference can be drawn that Schaeffer leaned into the car to conduct a search without consent.

Furthermore, once Schaeffer walked around the car to inspect the vehicle from the driver-side, Schaeffer conducted a "plain view search" by sticking his head through the open window.[4] (*Id.*)  Despite conducting these two searches without consent, Schaeffer again asked Jones for permission to search the entire vehicle. (*Id.*, Tr. MVR, Ex. 15 at 12)  Jones respectfully refused. (*Id.* at 13)  Finally, after approximately twenty-one minutes, Schaeffer and Massing allowed Jones to leave. (*Id.*)

On February 12, 2007, Jones wrote a letter to Woolwich Township Chief of Police, Defendant Russell Marino, complaining of the incident. (*Id.* at ¶ 38)  Jones described the alleged police misconduct, but did not allege a racial motivation. (*Id.* at Ex. 13)  When Jones did not receive a response, he called Marino who promptly came to Jones' house to pick up the letter. (*Id.* at ¶¶ 40-41)

Once there, Marino marveled at the size of Jones' house. (*Id.* at ¶ 42)  Marino "asked me if I played football, which is –

---

[4] This fact, of course, makes the previous inference much more likely.

you know, which is insulting." (*Id.*)

In response to Jones' complaints, Marino contacted Defendant Captain John Porter of the Investigative Division of the Glouster County Prosecutors's Office to conduct an internal investigation. (*Id.* at ¶¶ 47-48)  On February 28, 2007, Porter videotaped an interview with Jones.  (Porter & Dalton's Facts at ¶ 18)  Jones repeated many of the allegations in the February 12 complaint, but now alleged the stop to be racially motivated.  (*Id.* at ¶¶ 19-20)

Porter never interviewed Schaeffer in response to the incident.  Although the documentation states that Schaeffer was only charged administratively - as opposed to criminally - and thus had no basis to plead the Fifth Amendment, Porter testified that he verbally advised Schaeffer that the investigation was criminal.  (Jones' Facts at ¶¶ 68-69)  As a result, Porter testified that Schaeffer exercised his right to remain silent and Porter and Defendant Sean Dalton, the Glouster County Prosecutor, honored Schaeffer's decision.  (*Id.* at ¶¶ 51, 69)  At trial, however, Schaeffer testified that he was never advised of any criminal investigation, he never invoked his right to remain silent and nobody ever even asked him to give a statement.  (*Id.* at ¶ 96)

On March 18, 2007, Jones had further trouble with the Woolwich police.  (Jones' Facts at Ex. 14)  A then unidentified

8

police officer - now suspected to be Officer Daniels - tailgated Jones for several miles. (*Id.*) To avoid a confrontation, Jones pulled into a gas station. (*Id.*) To Jones' consternation, however, the police officer waited for Jones to leave and then resumed tailgating within inches of Jones' rear bumper. (*Id.*)

Shortly after this incident, Jones sent Marino another letter complaining of police harassment. (*Id.*) In this letter, Jones reiterated his belief that these incidents were racially motivated. (*Id.*) As time elapsed, it appears that Jones became increasingly convinced that his troubles with the Woolwich Police Department were due to racial animus.

On March 21, 2007, Porter required Jones to give a sworn statement. (*Id.* at ¶ 76) By contrast, Porter did not require any police officer to give a sworn statement or, in the case of Schaeffer, give any statement whatsoever. (*Id.* at ¶¶ 77-78)

Astonishingly, based on Jones' complaints and interviews, Porter decided to file a criminal complaint against Jones, charging him with two counts of giving false information and one count of false statements under oath in violation of New Jersey law. (*Id.* at ¶ 52) Dalton authorized the complaint. (*Id.*, Dep. Dalton, Ex. 9 at 67:11-21)

The supposed justification behind the criminal complaint were certain discrepancies between the February 4, 2007 MVR and Jones' subsequent complaints and interviews. (*Id.* at ¶¶ 54, 58-

62)  With the benefit of full video and audio hindsight, Porter meticulously compared the MVR to Jones' letters and decided to charge the victim despite clear violations of police procedure and the Constitution.

At the Grand Jury, Porter was the only witness against Jones.  (*Id.* at ¶ 54)  He first testified that none of Jones' assertions in the letter of February 12, 2007 were true.  (*Id.* at ¶ 55)  Porter later qualified his statement inasmuch as only fourteen to fifteen points in the complaint were untrue.  (*Id.*, Tr. Grand Jury, Ex. 8 at 7)  Based on Porter's testimony, the Grand Jury returned an indictment on all counts.  (*Id.* at ¶ 64)

On December 16, 2008, Jones' criminal trial commenced.  (*Id.* at ¶ 65)  Schaeffer testified that Jones had not committed a traffic infraction or driven inappropriately.  (*See* Schaeffer's Facts at ¶ 35; Jones' Facts, Ex. 6 at 40-41)  Instead, Schaeffer indicated that he pulled Jones over in furtherance of his "community care-taking" authority.  (Jones' Facts at Ex. 6, 41)

Marino testified that he took no corrective actions towards Schaeffer or Massing besides having a "conversation."  (*Id.* at ¶¶ 89-90)  During cross examination, Marino's testimony oscillated between condoning Schaeffer's actions and denying that Woolwich procedure permitted such police misbehavior.  (*Id.* at ¶¶ 89-92, 95)  In fact, Marino admitted that he would have conducted a police stop identically in similar circumstances.  (*Id.* at ¶ 91)

10

On December 19, 2008, Jones was acquitted on all counts.

(*Id.* at ¶ 65)  Judge Allen-Jackson contemptuously summarized the prosecution's case as follows:

> On a night when it was negative nine degrees outside, according to the testimony or according to the video.  And to turn that complaint about the way he was stopped, the method of questioning, the search of his car.
> Leaning into his car, which in and of itself is a search.  To turn it from that into a complaint against Mr. Jones is unbelievable.
> It is absolutely incredible to this Court to think that you can take this complaint and present it to the Grand Jury the way that the State did.
> ...
> Once that complaint was received in the Prosecutor's Office, you had the complaint and you had the video but you called him in after that and continued to try to question him.
> To swear him in, in order to establish a case then against the person who had complained.  When you had a video that did not have probable cause for a stop, that did not have a reasonable, articulable suspicion for a stop.

(*Id.*, Tr. Trial Closings & Verdict, *New Jersey v. Jones*, Dec. 18, 2008, Ex. 7 at 69, 72)[5]

On January 12, 2009, Jones filed the Complaint in this case. (*See* Dkt. No. 1)  By September 23, 2011, all three Motions for Summary Judgment had been filed.  (*See* Dkt. Nos. 117, 120, 124) It was not until February 6, 2012, however, that briefing closed and the Motions were ripe for decision.  (*See* Dkt. No. 144)

---

[5] Quotations from the decision in Jones' criminal trial here are not meant to suggest that those findings would be binding, or even admissible, in this civil trial.  The language only serves to emphasize the reasoning behind Jones' acquittal.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.R.Civ.P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock*, 794 F.2d at 864.

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 249.

12

**III.**

Three separate Motions for Summary Judgment are presently before the Court: one from Schaeffer, one from Dalton and Porter, and one from Marino and the Township of Woolwich ("Woolwich").

**A.**

Jones alleges two distinct claims against Schaeffer: 1) a violation of his Fourth Amendment rights brought under § 1983,[6] and (2) a conspiracy to violate Jones' civil rights pursuant to § 1985(3).[7]

In support of summary judgment, Schaeffer argues qualified immunity. To establish the affirmative defense, Schaeffer must satisfy a two-pronged test. First, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). Second, defendants may nevertheless "be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person

---

[6] Jones alleges violations of analogous sections of the New Jersey State Constitution. The protections afforded under the New Jersey Constitution are at least as great as the federal Constitution. *See Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 79 (1978). However, no party argues that the protections under the New Jersey Constitution would necessitate a different result in this case. The § 1983 and CRA claims alleged against each Defendant will, therefore, be analyzed together.

[7] This civil conspiracy claim is the only one alleged against all Defendants.

13

would have known." *Id.* at 739.

### 1.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "A traffic stop is a seizure of everyone in the stopped vehicle." *U.S. v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006). The only issue, therefore, is whether the initial seizure was reasonable. Relevant to this case, there are two potential justifications for the stop: (1) Schaeffer witnessed a motor vehicle violation, and (2) the community caretaker doctrine.

First, a police officer "who observes a violation of state traffic laws may lawfully stop the car committing the violation." *U.S. v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). The stop is legitimate even if the technical violation of the traffic code was merely a pretext to investigate other suspected criminal activity. *See Whren v. U.S.*, 517 U.S. 806, 819 (1996).

Here, whether Schaeffer actually observed Jones violate a traffic law is disputed. At Jones' criminal trial, Schaeffer testified that Jones did not commit a motor vehicle violation or drive inappropriately. In depositions for this case, however, Schaeffer changed his mind. Defendant's arguments to the

14

contrary notwithstanding, Schaeffer's prior sworn testimony is
extremely relevant and admissible in this civil case.  *See*
Fed.R.Evid. 801(d).  This dispute of fact, brought about entirely
by Schaeffer's own conflicting testimony, prohibits a
justification for the seizure based on a violation of the traffic
code.

Second, the community caretaker function of police officers
can, in certain instances, justify a police stop.  "In performing
this community caretaking role, police are expected to aid those
in distress, combat actual hazards, prevent potential hazards
from materializing and provide an infinite variety of services to
preserve and protect public safety."  *U.S. v. Smith*, 522 F.3d
305, 313 (3d Cir. 2008) (quoting *U.S. v. Coccia*, 446 F.3d 233,
238 (1st Cir. 2006).  The community caretaking function is
"totally divorced from the detection, investigation, or
acquisition of evidence relating to the violation of a criminal
statute."  *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

In this case, Schaeffer argues that he pulled Jones over
because he seemed lost.[8]  The argument, however, contradicts
Schaeffer's actions.  Schaeffer only witnessed Jones make one U-
turn and take one turn that slightly elongated Jones' route.
Incredibly, after the stop, the first question Schaeffer

---

[8] The Court highly doubts, and Schaeffer provides no case law, that
appearing lost satisfies the criteria of the community caretaker exception.
Nevertheless, the Court need not reach that issue.

accusatorially asked was why Jones had exited an industrial
parking lot. (*See* Br. Jones, Tr. MVR, Ex. 12 at 1)  While it is
well-settled that a traffic violation may serve as a pretext to
investigate other suspected criminal activity, the Court has
uncovered no such rule for the community caretaker exception.
Even if Schaeffer initially thought that Jones was lost, which is
wholly undermined by Schaeffer's actions, upon discovering Jones
was not lost, Schaeffer would not be justified in conducting an
investigation.  Only a jury will be able to determine the extent
of Schaeffer's credibility.

Without a legitimate reason, stopping Jones was unreasonable
and any subsequent alleged searches or frisks would also be
unreasonable.[9]  Jones has thus established a constitutional
violation and the first prong of the qualified immunity analysis
has been satisfied.[10]

Furthermore, there can be little doubt that the right to be

_____

[9] Much of the case law concerning unconstitutional Fourth Amendment
searches revolve around whether the government's prior illegal acts tainted
the procured evidence, which would warrant suppression of that evidence in a
criminal trial.  *See, e.g., U.S. v. Stabile*, 633 F.3d 219 (3d Cir. 2011).
Although no illegal evidence was found to suppress here, the same principles
apply to the constitutionality of the subsequent searches.

[10] Assuming *arguendo* that the stop was constitutional, each search was
independently unconstitutional.  First, Schaeffer's insertion of his hands
into Jones' pockets exceeded the scope of a constitutional *Terry* frisk.  *See
U.S. v. Johnson*, 2011 WL 5865428, *6 (3d Cir. 2011).  Second, the two vehicle
searches were not based on probable cause or any recognized exception.
Finally, Schaeffer could articulate no reasonable suspicion to administer a
sobriety field test.  *See U.S. v. Johnson*, 434 Fed.Appx. 159, 162 (3d Cir.
2011).  Indeed, Schaeffer admitted that it was too cold and windy to formulate
a reasonable, articulable suspicion.

free from searches and seizures not based on probable cause or a recognized exception was clearly established.  With respect to Jones' § 1983 claim for an unlawful search and seizure, Schaeffer is not entitled to qualified immunity and the Motion for Summary Judgment will be denied.[11]

## 2.

In a short half-page argument, Schaeffer declares that the "only remaining claims in this matter are those of malicious prosecution and Plaintiff's claims that Defendant Schaeffer racially profiled him."  (Br. Schaeffer at 35)  This characterization of the Complaint is patently erroneous.  In addition to the claim for racial profiling, Plaintiff has also alleged a civil conspiracy claim against Schaeffer under § 1985(3).[12]  On the other hand, the malicious prosecution claim is brought only against Dalton and Porter.

Neither party has briefed Plaintiff's claim "to be free from racially motivated and/or racially tainted police stops."

---

[11] Considering summary judgment will be denied on these grounds, the Court need not reach the issue of whether the stop was racially motivated. However, the Court merely notes here that there is at least a dispute of fact on that issue as well.  (*See* Br. Schaeffer at 24-25)  In the initial police complaint, Jones did not allege racial profiling, but later changed his mind. Only a jury will be able to evaluate the staggering amount of changed testimony by nearly every party in this case.

[12] Schaeffer makes no attempt to move for summary judgment on this claim despite an utter lack of evidence. *See infra* III.B.3.  Nonetheless, the Court will dismiss the claim because a conspiracy requires more than one conspirator and summary judgment will be granted as to every other defendant.

(Compl. ¶ 34)   The Court assumes that Jones meant to allege an equal protection claim pursuant to § 1983.   "To prevail on an equal protection claim in the racial profiling context, Plaintiffs would have to show that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose."   *Carrasca v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002).   "To prove discriminatory effect, [Plaintiff would have] to show that [he] is a member of a protected class and that [he] was treated differently from similarly situated individuals in an unprotected class."   *Bradley v. U.S.*, 299 F.3d 197, 206 (3d Cir. 2002).

First, Jones, an African American, is clearly part of a protected class.   Second, a reasonable inference can be drawn that Schaeffer does not brazenly violate the constitutional rights of every person he pulls over.[13]   Accordingly, Schaeffer's Motion will be denied on the equal protection claim.

**B.**

Jones alleges four claims against Dalton and Porter brought pursuant to § 1983: (1) malicious prosecution, (2) a First Amendment violation, (3) a violation of Due Process, and (4) a conspiracy to violate Jones' civil rights.   In addition, Jones

---

[13] Schaeffer does not brief the law or give any citations to the record in support of summary judgment on the equal protection claim.   This falls well short of the moving party's burden under Fed.R.Civ.P. 56.

alleges a conspiracy under § 1985(3) and state law claims for malicious prosecution.

In support of the Motion for Summary Judgment, Dalton and Porter first argue that absolute and qualified immunity shield them from § 1983 liability.  Second, they argue that Plaintiff has failed to establish a claim under § 1985(3).  Finally, Dalton and Porter argue that the state law malicious prosecution claim must fail because Jones did not file a notice of claim pursuant to N.J.S.A. 59:8-3.

### 1.

If absolute immunity attaches, a defendant will be shielded from § 1983 liability even for allegedly false statements made knowingly under oath.  *See Briscoe v. Lahue*, 460 U.S. 325, 336-37 (1983).  "In light of the Supreme Court's quite sparing recognition of absolute immunity to § 1983 liability, we begin with the presumption that qualified rather than absolute immunity is appropriate."  *Odd v. Malone*, 538 F.3d 202, 207-08 (3d Cir. 2008) (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 355 (3d Cir. 1999).

With regard to prosecutors, the mere identity of an individual as a prosecutor is not dispositive.  Courts must instead analyze the "unique facts of each case and . . . dissect[] the prosecutor's actions."  *Odd*, 538 F.3d at 210.

19

"[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  On the other hand, purely administrative or investigatory functions are not protected. *Id.; see also Yarris v. County of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006)*.*

First, the record reveals few actions Dalton personally undertook.  Indeed, Dalton only appears to have authorized Porter to file the criminal complaint.[14]  "The decision to initiate a prosecution is at the core of a prosecutor's judicial role." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992).  A prosecutor enjoys the benefit of absolute immunity "even where he acts without a good faith belief that any wrongdoing has occurred." *Id.* at 1464.  Dalton's authorization of his subordinate's decision to file a criminal complaint here falls comfortably within the scope of Dalton's role as the State's advocate.[15]  Therefore, Dalton is absolutely immune from § 1983

---

[14] Although Dalton also appears to have attended several meetings with Porter, there is no record regarding the substance of those meetings.  The only other allegation is that Dalton personally subpoenaed Jones' Philadelphia Police internal file.  It would be anomalous to allow this one investigatory action to deprive Dalton from absolute immunity entirely.

[15] Moreover, the *Monell* line of cases forbids § 1983 liability predicated on a theory of *respondeat superior*.  *See Monell v. Dep't of Soc. Srvs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Iqbal*, 129 S.Ct. at 1948.

liability and the Motion will be granted as to Dalton in full.[16]

Second, Porter, as an investigator, is not entitled to prosecutorial immunity, but seeks absolute immunity with respect to his grand jury testimony.  After briefing closed on these Motions, the Supreme Court resolved a Circuit split in *Rehberg v. Paulk*, __ S.Ct. __, 2012 WL 1069091 (2012).  "[W]e conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial.  This means that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." *Id.* at *9.  The work in preparation for such testimony is also absolutely immune.  *Id.*  Accordingly, Porter may not be held liable for § 1983 claims on the basis of his grand jury testimony or preparatory work therefor.

Both malicious prosecution and First Amendment retaliation claims require Plaintiff to prove that the proceeding was not initiated with probable cause.  *See Camiolo v. State Farm fire and Cas. Co.*, 334 F.3d 345, 362-63 (3d Cir. 2003); *Walker v. Clearfield County Dist. Attorney*, 412 Fed.Appx. 481, 483 (3d Cir.

---

[16] The Third Circuit seems to have adopted Justice White's concurrence in stating that prosecutorial immunity only attaches to claims that have a common law tradition of immunity such as malicious prosecution and defamation.  *See Odd*, 538 F.3d at 216.  This interpretation would only provide the basis for summary judgment as to the malicious prosecution and First Amendment retaliation claims.  Although Supreme Court precedent seems to indicate that prosecutorial immunity should attach to the act of filing a criminal complaint regardless of the underlying § 1983 violation, for the sake of thoroughness, the Court will also show that summary judgment is warranted based on the doctrine of qualified immunity for the remaining § 1983 claims.  *See infra* III.B.2.

2011).  A grand jury indictment is prima facie evidence of probable cause.  Absolute immunity prohibits Jones from rebutting this presumption with evidence that Porter made misrepresentations to the grand jury.  Accordingly, the Motion will be granted on these two claims.

## 2.

"Where absolute immunity does not apply, qualified immunity protects official action, if the officer's behavior was objectively reasonable in light of the constitutional rights affected." *Kulwicki*, 969 F.2d at 1463.  The familiar two-pronged analysis applies: (1) whether Plaintiff has established a constitutional violation, and (2) whether the right was clearly established at the time of the incident.[17]  *See Hope*, 536 U.S. at 736-39.

### a.

When a plaintiff sues under § 1983 alleging a state actor's failure to provide procedural due process, there is a two-part analysis: "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property; and (2) whether the procedures available

---

[17] Though Defendants would likely be protected by absolute immunity from the following two § 1983 claims, the Court is unable to perform the required analysis due to the sheer dearth of factual support.

22

provided the plaintiff with due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotations omitted).

Defendants argue that Jones was afforded all the procedural safeguards that the Constitution requires. During the criminal proceedings, Jones took advantage of those procedures and prevailed. Jones is further taking advantage of civil procedures here to seek damages. Plaintiff does not respond to this argument in his opposition brief.

The Court finds that Jones received all the processes that were constitutionally due. Accordingly, the Motion for Summary Judgment will be granted on the due process claim.

### b.

Plaintiff alleges two conspiracy claims: one under § 1983 and one under § 1985(3). A civil conspiracy under § 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Adams v. Teamsters*, 214 Fed.Appx. 167, 172 (3d Cir. 2007).

Here, Jones has failed to establish an agreement. The mere occurrence of several meetings between Dalton and Porter do not

establish a meeting of the minds.  Although Dalton and Porter

only move for summary judgment under § 1985(3), the argument

holds equal force here, and the Court will grant summary judgment

with respect to the § 1983 conspiracy claim.


**3.**

Under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving,
either directly or indirectly, any person or class of
persons of the equal protection of the laws, or of equal
privileges and immunities under the laws; and (3) an act
in furtherance of the conspiracy; (4) whereby a person is
either injured in his person or property or deprived of
any right or privilege of a citizen of the United States.

*United Brotherhood of Carpenters & Joiners of America, Local 610,*

*AFL-CIO v. Scott*, 463 U.S. 825, 829 (1983).  Defendants argue

that Jones has failed to establish the first two elements.

With respect to the first element, Jones has failed to

allege a conspiracy.  "To constitute a conspiracy, there must be

a meeting of the minds."  *Startzell v. City of Philadelphia*, 533

F.3d 183, 205 (3d Cir. 2008).  Without more, several meetings do

not prove a conspiracy.

Moreover, with respect to the second element, "there must be

some racial, or perhaps otherwise class-based, invidiously

discriminatory animus behind the conspirators' action."  *Griffin*

*v. Breckenridge*, 403 U.S. 88, 102 (1971).  Here, Jones has failed

to proffer evidence to suggest that Porter and Dalton conspired against Jones based on his race.[18]  Even if the Court were to conclude that the police stop was racially motivated, Jones has failed to submit any evidence of racial animus with respect to Porter and Dalton.  For these two independent reasons, the Motion for Summary Judgment on the § 1985(3) conspiracy claim must be granted.

**4.**

Plaintiff's final claim is for malicious prosecution under the New Jersey common law.  Porter and Dalton argue that Jones has failed to comply with the New Jersey Tort Claims Act ("TCA").

Under the TCA, plaintiffs must file a notice of claim for both intentional and non-intentional torts against a public entity or public employee within 90 days.  *See* N.J.S.A. 59:8-3; *Velez v. City of Jersey City*, 180 N.J. 284, 286 (2004).  Plaintiff does not respond to Defendants' argument and nothing in the record suggests that Plaintiff has complied with the statute.  Accordingly, the Motion for Summary Judgment will be granted on the common law claim for malicious prosecution.

---

[18] Jones' position is difficult to understand.  Depending on the circumstances, Plaintiff's position oscillates between asserting Defendants' acted out of racial animus (*e.g.*, this conspiracy claim) or vehemently denying ever alleging racial profiling (*e.g.*, the February 12 complaint).

**C.**

Jones alleges two claims against Marino and Woolwich: (1) a policy and custom of violating the Fourth Amendment brought pursuant to § 1983, and (2) a civil conspiracy under § 1985(3).

**1.**

As a preliminary matter, Defendants argue that the Court should construe Plaintiff's § 1983 claim to sue Marino only in his official capacity.  Suits against a state official in his or her official capacity represent "only another way of pleading an action against an entity which an officer is an agent."  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  Therefore, it would be duplicative to sue both Marino and Woolwich.

Plaintiff's Complaint is silent as to whether Marino is sued in his official or individual capacity.  The oversight is striking considering Defendant Dalton is specifically sued in both his official and individual capacities.  (*See* Compl. ¶ 6) Because there is no discernible distinction between the allegations against Marino and his official role as the Woolwich Chief of Police, the Motion will be granted with respect to Marino.[19]

---

[19] "The violations of Plaintiff's rights perpetrated by Defendant Schaeffer conformed to the policies, practices and customs of Defendant Marino as well as the Woolwich Township Police Department."  (Compl. ¶ 38)

**2.**

In actions brought pursuant to § 1983, "a municipality cannot be held liable . . . on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  Instead, Plaintiff must "provide evidence that there was a relevant [municipal] policy or custom, and that the policy caused the constitutional violation they allege."  *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).

The parties conflate the policy and custom standards in their briefs.  The two theories are significantly different, however, and must be analyzed separately.

First, a policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict."  *Id.* at 584 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).  To establish the claim, policymakers must be "on actual or constructive notice that a particular training program causes city employees to violate citizens' constitutional rights . . . [and] policymakers choose to retain that program."  *Id.* at 1360.

Here, Marino is the only relevant decisionmaker Jones addresses.  Although Marino's testimony reflects a gross misunderstanding of Fourth Amendment protections, Plaintiff has not submitted evidence to suggest that Marino officially instituted his misconceptions.  As such, Jones would have to prove that Marino failed to train his subordinates, yet Jones has submitted no evidence with regard to Woolwich's training program.  Therefore, Jones has failed to establish an unlawful municipal policy.

Second, an act becomes a custom when, though not authorized by law or a decisionmaker, it "is so widespread as to have the force of law."  *Board of Cnty. Com'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997).  "Custom requires proof of knowledge and acquiescence by the decisionmaker."  *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009).  Plaintiff also "bear[s] the burden of proving that the municipal practice was the proximate cause of the injuries suffered."  *Beck v. City of Pittsburgh*, 89 F.3d 966m 972 n.6 (3d Cir. 1996).  Causation can be established by showing "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."  *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

Here, Jones has failed to establish causation.  Although

Marino testified that he would have conducted an illegal police stop in similar circumstances, Jones has not established that similar unlawful conduct has occurred in the past.  Without prior unlawful conduct, Jones cannot establish that a custom developed to tacitly condone the present unlawful conduct.  Jones has only established that Marino is desperately in need of further instruction regarding the protections afforded by the Constitution.[20]  Unfortunately, Marino's misconceptions are not a cognizable claim based on an unlawful municipal custom.

Accordingly, Woolwich's Motion will be granted with respect to the claims based on an unlawful municipal policy or custom.

### 3.

Jones' final claim is for a civil conspiracy under § 1985(3).  Jones filed no opposition to this aspect of Woolwich and Marino's Motion.

The claim must fail for the same reasons stated above.  *See supra* Part III.B.3.  First, there is no evidence of a meeting of the minds.  Second, Jones has failed to proffer evidence to suggest that Marino conspired against Jones based on his race. Accordingly, summary judgment will be granted on the § 1985(3)

---

[20] Ironically, Marino's misconceptions along with the present constitutional violation could provide evidence of custom should the practice not be corrected in the future, but it does not provide a basis for liability in this case.

conspiracy claim.

### IV.

In sum, Schaeffer's Motion will be granted on the § 1985(3) civil conspiracy claim and denied in all other respects.

The Motions of Dalton, Porter, Marino, and Woolwich will be granted in full.


Dated: 4/3/12                    /s/ Joseph E. Irenas

                                 **JOSEPH E. IRENAS, S.U.S.D.J.**